UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-CR-718-ZMB |
| | ) | |
| SIDDHARTH JAWAHAR, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S PRESENTENCE INVESTIGATION REPORT OBJECTIONS (DOC. 120)**

The United States of America, by and through Thomas C. Albus, United States Attorney for the Eastern District of Missouri, and Derek Wiseman, Assistant United States Attorney for said District, and files this Response to Defendant's Presentence Investigation Report ("PSR") Objections. *See* Doc. 120. In response, the United States maintains that Defendant's PSR objections should be overruled, and states as follows:

## I. This Court Should Overrule Defendant's Objection Challenging the Restitution Amount that He Owes Deceased Victim F.G.'s Estate.[1]

Without evidence—and based only on his "belief"—Defendant brings two arguments against the restitution amount that he owes deceased victim F.G.'s estate: **(1)** that Defendant believes Victim F.G. has an "economic interest" in one of Defendant's former investments funds (*i.e.*, the "Beauty Fund"), and **(2)** that Defendant also believes that Victim F.G. already received

[1] As Defendant's PSR Objection makes clear, this argument relates to the restitution amount listed in PSR paragraph 91 and not the Guidelines loss amount finding in PSR paragraph 35. *See* Doc. 120, pp. 1–2. Based on Defendant's PSR Objection, the United States' response to this objection will focus only on the restitution amount that is owed to the estate of deceased Victim F.G. That said, the PSR correctly calculates that the loss amount under 2B1.1 as the full amount that Defendant fraudulently induced deceased Victim F.G. to invest after 2016. *See infra*, § II.

the full amount of his restitution "as part of a capital-loss treatment with the IRS." *See* Doc. 120, p. 2. This Court should reject both arguments because they are based on pure speculation.

**A. Legal Standard**

In determining the appropriate amount of restitution owed by Defendant, the Mandatory Victim Restitution Act ("MVRA") provides instructions for calculating restitution "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense." 18 U.S.C. § 3663A(b)(1). In such cases—like the present case—the defendant must "return the property to the owner," *id.* § 3663A(b)(1)(A), or if return of the property lost by the victim is "impossible, impracticable, or inadequate," the offender must pay the victim "an amount equal to . . . the value of the property" less "the value (as of the date the property is returned) of any part of the property that is returned," *id.* § 3663A(b)(1)(B). In the investment fraud context, the Supreme Court has held that "[t]he phrase 'any part of the property . . . returned' refers to the property the [lenders] lost, namely, the money they lent to [the defendant], and not to the collateral the [lenders] received." *Robers v. United States*, 572 U.S. 639, 639 (2014).

Under the MVRA, "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *United States v. Arrington*, 97 F.4th 593, 596 (8th Cir. 2024) (quoting 18 U.S.C. § 3664(e)). "Where the defendant seeks to offset the loss amount, the MVRA directs that '[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.'" *Id.* Applying that provision, the Eighth Circuit—along with seven other circuits—has held that a district court "did not err when it placed the burden on [the defendant] to prove the amount of offset he claimed was appropriate." *Id. See also United States v. Perry*, 714 F.3d 570, 578 (8th Cir. 2013) (holding that the defendant's "allegation of double recovery is entirely

speculative and his request for an offset was properly denied").

**B. Defendant Cannot Meet His Burden of Proving That Victim F.G.'s Loss Amount Should Be Offset By An Unspecified "Economic Interest" in Defendant's Former Investment Fund.**

Defendant's claim that Victim F.G.'s estate has an undefined "economic interest" in one of Defendant's former investment funds is based on pure speculation. *See* Doc. 120, p. 2. As the plea agreement makes clear, there is no dispute in this case—nor could there be—that Defendant defrauded Victim F.G. out of at least $2.5 million. *See* Doc. 104 ("Plea Agreement"), p. 3 (where defendant agreed that, "[d]uring his scheme to defraud, Defendant took approximately $35,607,948.16 from his investors," including Victim F.G.). Indeed, Victim F.G. gave Defendant $2.5 million based on Defendant's scheme to defraud—during which Defendant undertook a number of fraudulent actions to obtain Victim F.G.'s money:

- "Defendant falsely represented to Swiftarc Capital investors [including Victim F.G.] that PMP was trading at a much higher price than it actually was." *See* Doc. 104 ("Plea Agreement), p. 4.

- "Without informing potential Swiftarc investors [including Victim F.G.] that large portions of their investment dollars would fund Defendant's lifestyle and investor repayments, Defendant fraudulently persuaded potential Swiftarc investors to provide him with funds that they falsely believed would be invested in companies." *Id.* at 5.

- "While perpetrating his multi-million-dollar Ponzi scheme, Defendant used Swiftarc investor dollars [including Victim F.G.'s] to fund extravagant expenses." *Id.*

- "Defendant attempted to conceal his fraud from Swiftarc investors by—among other things—fraudulently representing to investors [including Victim F.G.] that their investments were earning falsely inflated profits, providing false reassurances that investor funds were being invested as promised, and failing to notify investors—prior to taking their money—that the Texas State Securities Board ordered Defendant to 'cease and desist from engaging in fraud.'" *Id.* at 7.

Without disputing the total amount that he took from Victim F.G. based on his fraud scheme ($2.5 million), Defendant claims that Victim F.G.'s restitution amount should be offset by an alleged—yet undefined—"economic interest" that Victim F.G. purportedly has in one of

Defendant's former investments funds (*i.e.*, the "Beauty Fund").[2] *See* Doc. 120, p. 2. In making this claim, however, Defendant does not specify Victim F.G.'s "economic interest" in the fund, nor does he specify the fund's value, the liquidity of the fund, or how many of Victim F.G.'s investment dollars were transferred into the fund. Instead, Defendant relies on pure speculation to assert that Victim F.G.'s restitution amount should be completely offset by an undefined "economic interest" in the fund. Because Defendant's claim relies on speculation—and not evidence—this Court should reject his argument under binding precedent.

In fact, the Eighth Circuit addressed a similar issue in *United States v. Arrington*, 97 F.4th 593 (8th Cir. 2024). As in this case, the parties in *Arrington* "agreed to [the loss] amount for the purpose of calculating Arrington's Sentencing Guidelines range." *Id.* at 596. And similar to Defendant here, the defendant in *Arrington* "asked the district court for an offset [in the restitution amount] equal to the value of the shares he sold to [the victim]."[3] *Id.* There, the Eighth Circuit held that the district court properly "placed the burden on Arrington to prove the amount of offset he claimed was appropriate." *Id. See also Perry*, 714 F.3d at 578 ("Perry's allegation of double recovery is entirely speculative and his request for an offset was properly denied."). The Eighth Circuit's holding applies with equal force in this case.

Applied here, Defendant has not—and cannot—meet his burden of proving that Victim

[2] During the United States' investigation, investigators uncovered that the Beauty Fund was an investment fund run by Defendant during his scheme to defraud. In approximately 2023, the fund was transferred by Defendant to a third-party venture capital firm. Investigators believe that there are no upcoming liquidity events for this fund, and the United States can find no basis for Defendant's claim that Victim F.G.'s estate has a definable economic interest in the fund that could fully offset his restitution amount in this case.

[3] Unlike *Arrington*, Defendant here does not claim that he sold any shares of stock to Victim F.G. Instead, Defendant claims, without evidence, that he placed an unspecified amount of Victim F.G.'s investment dollars into an investment fund that Defendant subsequently transferred to a third-party venture capital firm.

F.G.'s loss amount is offset by an alleged and undefined economic interest in the Beauty Fund. Because Defendant's argument is based only on his belief—and not on any evidence—Defendant cannot meet his burden of establishing the offset amount. Therefore, this Court should overrule Defendant's PSR objection and order him to pay back to Victim F.G.'s estate the full amount of restitution that Defendant owes.

**C. This Court Should Reject Defendant's Argument That Victim F.G.'s Restitution Amount Should Be Offset by a Speculated Tax Write-Off With the IRS.**

Just like his first restitution challenge, Defendant relies on pure speculation in making the claim that Victim F.G. already received his restitution amount through a capital-loss agreement with the IRS. *See* Doc. 120, p. 2. Far from meeting his burden to prove an offset, Defendant has not produced any evidence of an agreement between Victim F.G. and the IRS, nor has he established that Victim F.G. has already received the full value of the restitution that Defendant owes the victim's estate through such an agreement.[4] Therefore, under Eighth Circuit precedent, this Court should reject Defendant's argument that Victim F.G.'s restitution amount should be offset based on a speculated agreement between Victim F.G. and the IRS. See *Arrington*, 97 F.4th at 596; *Perry*, 714 F.3d at 578.

But even if Defendant could show that Victim F.G. already received his restitution amount through an IRS agreement—which he cannot—this Court should still reject his argument. In fact, the Fifth Circuit recently applied the MVRA to reject a similar argument. *See United States v. Borino*, 123 F.4th 233, 251 (5th Cir. 2024). Like Defendant here, the defendant in *Borino* argued that his victims were not entitled to restitution "because tax savings [the victims] . . . received

[4] Notably, Defendant's argument that Victim F.G.'s full restitution amount was a total loss for tax purposes is inconsistent with his first argument that Victim F.G.'s investment dollars were not lost at all.

exceed the amount of [their loss].” *Id.* at 248 (cleaned up). The Fifth Circuit aptly described the argument as follows: “by arguing that the program participants have no actual loss, Borino essentially asks the court to permit him to tell the participants, relative to the fees that *he* owes to *them*: ‘Take what *I* owe *you* out of what *you* (might) owe the *IRS*.’” *Id.* at 251. The Fifth Circuit then properly rejected that argument because the defendant’s “obligation to pay restitution . . . is not canceled or forgiven simply because the [victims] may themselves have (thus far) paid less taxes to the IRS[.]” *Id.* Therefore, even assuming that Defendant here could meet his burden of proving that Victim F.G. already received his restitution amount via an IRS settlement, this Court should still reject Defendant’s argument under the same reasoning that the Fifth Circuit employed in *Borino*.

## II. Defendant’s Objection to the $36 Million Loss Amount is Foreclosed by Precedent.

Before addressing Defendant’s objection to the $36 million loss figure in Paragraph 35, it is important to note the areas of agreement between the parties on the loss amount. First, under the express terms of the plea agreement, the parties agree that the loss amount is more than $25 million under U.S.S.G. Section 2B1.1(b)(1)(L). *See* Doc. 104 (“Plea Agreement”), p. 9.[5] Second, the parties also agree that Defendant “devised a scheme to defraud over 60 investors [out] of $36 million dollars by means of material false and fraudulent representations and promises.” *See* PSR, ¶ 6.[6] And third, the parties also agree that—out of the $36,057,984.16 that Defendant fraudulently

[5] Prior to responding to Defendant’s PSR Objection, undersigned conferred with counsel for Defendant, who agreed that this objection has no impact on this Court’s application of the Sentencing Guidelines. Therefore, the parties’ agreement in the plea agreement that the loss amount exceeds $25 million under U.S.S.G. Section 2B1.1(b)(1)(L) is still in effect.

[6] Defendant correctly points out that the parties’ plea agreement stated that Defendant defrauded investors out of $35,607,984.16, *see* Doc. 104, p. 3, which is $450,000 less than the loss amount in the PSR ($36,057,984.16). The additional $450,000 of loss comes from the $500,000 that Defendant stole from Victim M.B., and subtracts out the $50,000 that Victim M.I. was repaid. *Compare* Doc. 106 (“Original Restitution Questionnaire”), *with* Doc. 113 (“Amended Restitution

took from his victims—he made payments during his fraud scheme to some of his victims in the total amount of $6,013,505.25. *See* Doc. 113.

Without disputing that he defrauded his investors out of $36,057,984.16, Defendant requests that this Court reduce the loss amount, under Comment 3(D)(i) of U.S.S.G. Section 2B1.1, by the amount of "money [he] returned" to investors, "and the fair market value of . . . [his] services rendered." *See* Doc. 120, p. 2 (quoting U.S.S.G. § 2B1.1, cmt. n. 3(D)(i)). Therefore, Defendant requests that this Court reduce the $36,057,984.16 loss amount by: **(1)** the $6,013,505.25 in payments that he made to investors during his fraud scheme; and **(2)** the $600,000 in business expenses that Defendant claims to have spent during his scheme—making Defendant's requested loss amount $29,444,478.91. *Id.* This Court should reject both arguments because they are foreclosed by Eighth Circuit precedent.

**A. Legal Standard**

The Sentencing Guidelines make clear that "[l]oss is the greater of actual loss or intended loss." *See* U.S.S.G. § 2B1.1(b)(1)(A). When calculating actual loss, the Guidelines recommend that the loss should be reduced by the amount of "money [Defendant] returned" to investors, "and the fair market value of . . . [his] services rendered." *See* U.S.S.G. § 2B1.1, cmt. n. 3(D)(i). In cases like this, however, where a defendant made some payments to his victims during his Ponzi scheme, the Eighth Circuit has held that "it is intended loss rather than actual loss that typically is the focus of a sentencing court's inquiry when a court considers whether to grant credit for repayments." *United States v. Hartstein*, 500 F.3d 790, 798 (8th Cir. 2007). Indeed, if a defendant's "subjective intent regarding repayments relates to this illegal purpose of perpetuating the scheme, a sentencing

Questionnaire"). *See also* Doc. 112 ("Victim M.B.'s Victim Impact Statement"); PSR, ¶¶ 21, 28, and 91. Defendant does not dispute that the additional $500k that he stole from Victim M.B. should be included in the loss calculation. *See* Doc. 120.

court may refuse to credit repayments against sums received from the victims." *United States v. Hartstein*, 500 F.3d 790, 800 (8th Cir. 2007). *See also United States v. Hatchett*, 622 F.3d 984, 988 (8th Cir. 2010) (holding that "the court was permitted within its discretion to refuse to credit Hatchett's payments against his loss amount" because "[t]he court found that Hatchett's subjective intent in making the repayments was to further his scheme"); *United States v. Alfonso*, 479 F.3d 570, 572 (8th Cir. 2007) ("Ponzi scheme operators . . . should not reap sentencing benefits for making payments to investors that are designed to perpetuate their scheme.").

In determining loss under the Guidelines, the Eighth Circuit has consistently held that "[a] sentencing court must calculate a reasonable estimate of the loss based upon a preponderance of the evidence." *Hatchett*, 622 F.3d at 987 (quoting *United States v. Boesen*, 541 F.3d 838, 850 (8th Cir. 2008)). *See also* U.S.S.G. § 2B1.1 cmt. n. 3(B) ("The court need only make a reasonable estimate of the loss."). The Eighth Circuit has further noted that, "[a]lthough the burden is on the government to prove loss, a defendant's wholly unsubstantiated statements are not enough to counter or even question the court's acceptance of proof of loss." *United States v. Craiglow*, 432 F.3d 816, 820 (8th Cir. 2005) (quoting *United States v. Swanson*, 394 F.3d 520, 527 (7th Cir. 2005)).

**B. Defendant's Payments to Victims in Furtherance of His Fraud Scheme Should Not Offset His Loss Amount.**

Defendant's argument that his Ponzi payments should offset the loss amount is inconsistent with the facts and the law. First, Defendant's objection to the loss amount in the PSR is inconsistent with the statements that he made to the United States during his proffer interview. During Defendant's post-indictment proffer interview, Defendant was represented by counsel, and he was specifically admonished that he had to tell the truth. *See* Attachment A ("Report of Proffer

Interview").[7] During his proffer interview, Defendant told the United States that he was in agreement with the $35 million loss amount that was charged in the Indictment. *Id.* at 12. Contrary to his proffer statements, Defendant is now claiming that his loss amount should be reduced by the Ponzi scheme payments that he made to his victims in furtherance of his fraud.

Not only is Defendant's loss amount objection inconsistent with his proffer statements, it is also foreclosed by binding Eighth Circuit precedent. In fact, the Eighth Circuit has consistently held that Ponzi scheme payments made to investors cannot be used to offset the loss amount where the defendant's "subjective intent in making the repayments was to further his scheme." *Hatchett*, 622 F.3d at 988. *See also Alfonso*, 479 F.3d at 572 ("Ponzi scheme operators . . . should not reap sentencing benefits for making payments to investors that are designed to perpetuate their scheme."). In *Hatchett*, for example, the Eighth Circuit held that the district court was "within its discretion to refuse to credit Hatchett's payments against his loss amount" where "Hatchett chose to repay his initial investors with funds from later investors in order to keep the initial investors satisfied and to attract others." *Hatchett*, 622 F.3d at 988.

This Court should reach the same conclusion here. That is because the record here is replete with evidence that Defendant made his investor payments to further his Ponzi scheme. For example, an unobjected to provision in the PSR makes clear that "Jawahar . . . used new investors to pay back previous investors in order to maintain the scheme." PSR, par. 9. In addition, the Plea Agreement also includes ample evidence that Defendant made his investor payments in furtherance of his fraud scheme:

- Rather than making the investments that he had promised his investors he would make,

[7] Before his proffer, Defendant and his counsel signed a proffer agreement. *See* Attachment B ("Proffer Agreement"). Before filing this response, undersigned conferred with counsel for Defendant, who stated that he did not have an objection to the use of Defendant's proffer statements at sentencing.

Defendant fraudulently used newly acquired investor money to pay back previous investors[.] *See* Doc. 104 ("Plea Agreement"), p. 3.

- Instead of making the investments that he promised to make on his investors' behalf, Defendant spent his investors' money on Ponzi scheme payments to previous investors[.] *Id.*

- On or about July 1, 2022, Defendant falsely and fraudulently promised J.H. (a Swiftarc investor in Ohio) that Defendant would invest $250,000 of J.H.'s money in Company #4. Instead of making the promised investment, however, Defendant used the majority of J.H.'s $250,000 investment to repay M.S. Defendant then falsely represented to M.S. that the source of his repayment was a return on his investment in Company #2—an investment that Defendant had never actually made. *Id.* at 7.

Because the undisputed evidence demonstrates that Defendant made his investor payments in furtherance of his fraud scheme, those payments cannot offset the loss amount. Therefore, this Court should overrule Defendant's PSR objection and hold that the loss amount is $36,057,984.16. *See* PSR, ¶ 35.[8]

### C. The Loss Amount Should Not Be Offset By Purported Business Expenses That Defendant Spent to Perpetuate His Fraud.

This Court should also reject Defendant's argument that the $36 million loss amount should be reduced by the $600,000 in purported business expenses that Defendant spent during his scheme to defraud. While the Guidelines permit a loss figure to be reduced by "the fair market value of the . . . services rendered" by a defendant, *see* U.S.S.G. § 2B1.1, cmt. n. 3(D)(i), the Eighth Circuit has specifically "rejected the argument that one who commits a fraud is entitled to his business expenses 'in perpetrating a fraud.'" *Craiglow*, 432 F.3d at 820–21 (quoting *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998)).

[8] As the PSR makes clear, Defendant paid some of his victims more than their principal investment. *See* PSR, ¶ 21. In total, Defendant paid investors over $1 million in excess of those investors' investments. *Id.* The Guidelines commentary explicitly addresses this situation—stating that "the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme." *See* U.S.S.G. § 2B1.1, cmt. n. 3(E)(iv).

The Eighth Circuit's holding in *Craiglow* is dispositive. Like the fraud scheme perpetrated by Defendant here, the Court in *Craiglow* "found that Craiglow was involved in a scheme to defraud investors in which he used later investors' money to pay early investors." *Id.* at 820. When the defendant requested to offset his loss amount based on his "legitimate business expenses[,]" the Eighth Circuit held that the defendant "is not entitled to deduct any business expenses" because "[t]he record contains no evidence any victim received fair market value of any legitimate business service." *Id.* at 820–21. This Court should reach the same conclusion here for the very same reason.

## III. Defendant's Objection to the Obstruction Enhancement is Belied by the Record.

After his arrest in this case, Defendant undertook a series of obstructive actions, each of which is sufficient to warrant a two-level increase under U.S.S.G. § 3C1.1. The provisions of the PSR, to which Defendant has not objected,[9] detail his obstructive conduct:

> **(1)** On January 18, 2024, after his arrest in the instant offense, during a recorded jail call, the defendant contacted victim S.E., who mentioned during the call their upcoming interview with the FBI regarding Jawahar. The defendant directed S.E. to "be dedicated." S.E. took this as him wanting S.E. to only provide limited information to the FBI, and to not throw Jawahar "under the bus." *See* PSR, ¶ 22.
>
> **(2)** [T]he defendant's recorded jail calls included multiple admissions to his associates that he lied to the Court about being indigent. *See* PSR, ¶¶ 23–24.
>
> **(3)** In another recorded jail call, translated from Hindi to English, the defendant speaks to his sister Priyanka, and advises he . . . suggests Priyanka go to Miami to obtain his iPad "the same day or next day." He stresses the importance of getting the iPad to his attorney. Priyanka informs him that his phone "has already reached Missouri" and the phone's GPS "was activated" and she "had seen it." Jawahar says, "Oh shit! It means they have opened up [the phone]." He follows up by saying, "then the next thing is to clean up [erase data] the phone using the iPad." He then instructs Priyanka to "write important notes." The defendant goes on to say, "the name is iPhone 15. Zee will teach [Priyanka] how to clean iPhone using iPad." He further states, "after cleaning up the phone from iPad, [she] can keep iPad with her and give it to [his] attorney. He further asserts, he "can't speak more in these regards as there is a possibility of a mishap, [he]

[9] As his Objections to the PSR make clear, Defendant does not object to the facts in the PSR that detail his actions. *See* Doc. 120, pp. 3–4. Instead, Defendant argues that those undisputed facts do not support an obstruction enhancement under Section 3C1.1. *Id.*

> had already cleaned up other things." Jawahar again instructs Priyanka to "clean up iPhone 15 only as [he] has already cleaned up everything else." Priyanka says, she "will clean up everything." He argues, she "won't be able to do it, [and that she] doesn't understand that [he] will not have anything left in his defense." Priyanka asks, if she "needs to show it somewhere to get it cleaned." He says, "no, it's very simple…., it's possible that they [investigators] would have just opened up the [phone] and may not have done anything else with it. In case [she] is unable to do it [clean up the iPhone 15], then [he] will teach Priyanka when she will come over to meet with [him]." Jawhar then says Priyanka "can start googling it as whenever a phone is lost, this procedure has to be followed." He says, he "can't talk about it again." Priyanka asserts, "don't speak repeatedly about it, and has understood it." *See* PSR, ¶ 25.

Defendant's undisputed conduct clearly warrants a two-level obstruction enhancement under the plain text of the Guidelines and Eighth Circuit precedent.

**A. Legal Standard**

The Sentencing Guidelines impose a two-level obstruction enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." *See* U.S.S.G. § 3C1.1. According to the Eighth Circuit, "[t]his includes 'threatening, intimidating, or otherwise unlawfully influencing' a witness." *United States v. Boen*, 59 F.4th 983, 996 (8th Cir. 2023) (quoting *United States v. Maurstad*, 35 F.4th 1139, 1146 (8th Cir. 2022)). The Eighth Circuit has further noted that "[t]he Guidelines have a broad view of obstruction—it can vary in nature and seriousness, and does not require a direct threat." *Id.*

The Guidelines provide examples of conduct that qualifies under the obstruction enhancement. *See* U.S.S.G. § 3C1.1. cmt. n. 4. Such conduct includes:

> **(A)** threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;
>
> . . .
>
> **(D)** destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so;
>
> . . .

> **(F)** providing materially false information to a judge or magistrate judge;
>
> . . .
>
> **(H)** providing materially false information to a probation officer in respect to a presentence or other investigation for the court[.]

*See* U.S.S.G. § 3C1.1. cmt. n. 4(A),(D),(F), and (H). In addition, the Eighth Circuit has expressly held that "[c]oaching a witness can constitute an obstruction of justice." *Boen*, 59 F.4th at 996 (citing *United States v. Jensen*, 834 F.3d 895, 899–900 (8th Cir. 2016)).

**B. Defendant Attempted to Obstruct Justice When He Directed Victim S.E. To "Be Dedicated" During His FBI Interview.**

There is no dispute about the facts here. After his arrest—and from jail—Defendant called Victim S.E. *See* PSR, ¶ 22. During the call—right after Victim S.E. mentioned that he had an upcoming interview with the FBI—Defendant "directed S.E. to 'be dedicated.'" *Id.* During Victim S.E.'s subsequent interview with the FBI, he told investigators that he understood Defendant to be saying exactly what he meant: "to only provided limited information to the FBI, and to not throw Jawahar 'under the bus.'" *Id.* The Magistrate Judge in this case reviewed this same evidence when determining Defendant's bond. *See* Doc. 32, p. 6. After listening to the jail call—and evaluating the evidence—the Magistrate Judge aptly described Defendant's conduct a "threat to a witness captured on a jail call." *Id.* This conduct is the precise type of witness coaching that the Eighth Circuit has consistently upheld as obstructive under Section 3C1.1. *Boen*, 59 F.4th at 996 (citing *Jensen*, 834 F.3d at 899–900).

**C. Defendant Also Attempted to Obstruct Justice When He Provided Materially False Information to the Court and the Probation Office.**

During his bond determination in this case, the Magistrate Judge explicitly "conclude[d] that Defendant has intentionally lied, or that the very least obscured, facts about his home plan, immigration status, and finances." *See* Doc. 32, p. 5. ("As to his immigration status, **Defendant lied to the [pretrial/probation] officer in Florida claiming he was a legal permanent**

**resident**[.]") (emphasis added). The PSR further details that "the defendant's recorded jail calls included multiple admissions to his associates that he lied to the Court about being indigent." *See* PSR, ¶¶ 23–24. This conduct certainly qualifies as "providing materially false information to a judge or magistrate judge . . . [and] to a probation officer in respect to a presentence or other investigation for the court[.]" *See* U.S.S.G. § 3C1.1. cmt. n. 4(F) and (H).

### D. Defendant Also Attempted to Obstruct Justice When He Instructed His Sister To Delete Evidence From His iPhone.

In his PSR Objection, Defendant does not dispute that—during a jail call following his arrest—he began speaking to his sister in Hindi and directed her to remotely wipe his iPhone, which was in the possession of the FBI. *See* PSR, ¶ 25. This unquestionably qualifies as obstruction under Section 3C1.1. In his PSR Objection, Defendant falsely maintains that he directed his sister to wipe the phone "not for her to obstruct" but to hide "text messages with other women that he did not want known by his partner." *See* Doc. 120, p. 4. This statement is false. In fact, Defendant's claim is directly contradicted by the statements he made to the United States during his proffer. During his proffer, he told investigators the following:

> After Jawahar's arrest in January 2024, Jawahar made some panic-ridden calls. Jawahar told his sister to wipe his iPhone in Hindi. Jawahar was afraid the iPhone would fall into the wrong hands. Jawahar was unsure if his sister wiped the phone or not. **This was part of Jawahar's misguided effort to try and hide his culpability**. In addition, Jawahar wanted to clean the iPhone because his sister had expressed to Jawahar that his girlfriend, Alexis, had seen some texts with other women.

*See* Attachment A ("Report of Proffer Interview"), p. 12 (emphasis added). Defendant's intent is clear from the content of the call, its context, and his own proffer admission. Therefore, this Court should overrule his PSR objection, and hold that the two-level enhancement for obstruction applies.

## IV. Pursuant to the Plea Agreement, the United States Agrees that Defendant Meets the Zero Point Offender Criteria Under Section 4C1.1(a)(2) through (a)(10).

On this point, the parties' plea agreement states the following: "[i]f the defendant does not receive any criminal history points from Chapter 4, Part A, then the parties agree that two levels should be deducted from the total offense level under Section 4C1.1(a), because the defendant meets all of the criteria under Section 4C1.1(a)(2) through (a)(10)." *See* Doc. 104, p. 11. Therefore, pursuant to the plea agreement, the United States agrees that Defendant meets the criteria under Section 4C1.1.

Respectfully submitted,

THOMAS C. ALBUS
United States Attorney

*<u>/s/ Derek J. Wiseman</u>*
DEREK J. WISEMAN, #67257MO
Assistant United States Attorney
111 S. 10th Street, Rm. 20.333
St. Louis, Missouri 63102
(314) 539-2200

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2026, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon counsel for the defendant.

/s/ Derek J. Wiseman
DEREK J. WISEMAN #67257MO
Assistant United States Attorney